UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-20228-ALTMAN/Sanchez

VIVIAN RUIZ RONDON,

      *Plaintiff,*

*v.*

CARNIVAL CORPORATION
*d/b/a*
CARNIVAL CRUISE LINE,

      *Defendant.*

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On May 12, 2023, our Plaintiff, Vivian Ruiz Rondon, was enjoying a spring cruise aboard the Carnival *Celebration*, *see* Joint Trial Stip. [ECF No. 83] at 1, when she tripped and fell over a threshold in the hallway outside her cabin, *see* Carnival's CCTV Footage of the Fall, Joint Ex. 1 [conventionally filed]. The parties skipped summary judgment and proceeded to a bench trial, where we heard from both sides' witnesses and received dozens of exhibits into evidence.

At trial, the lawyers did a decent job of narrowing the disputed issues. The Defendant, for instance, *doesn't* dispute that, because of her fall, Rondon suffered a broken right arm, a dislocated right shoulder, and partial tears to two tendons in her right rotator cuff—the subscapularis and the infraspinatus. *See* Day 7 Trial Tr. [ECF No. 118] at 1141:23–1142:19. The Plaintiff, for her part, conceded that she'd failed to adduce evidence for her actual-notice claim, *see id.* at 1081:01–03—and she withdrew her request for damages for injuries to her "index finger," "knee," and "head," *id.* at 1080:18–25. She also reduced her overall damages request to about $4.1 million, *see id.* at 1125:07–10 (agreeing with an approximately "4.1 million" figure)—down from her initial claim of nearly $14

million, *see* Pl.'s Prop. Find. of Fact and Concl. of Law [ECF No. 64] ¶ 139 (requesting $13,764,894.50 pre-interest).[1]

Still, by the time the lawyers had finished their closing arguments, several disputed issues remained. For instance, the Defendant continued to insist that the threshold over which Rondon tripped *wasn't* defective and claimed that, even if it was, Carnival had no notice of that defect. As we've said, at trial, Rondon conceded that she'd failed to show *actual* notice—so we'll be entering judgment for the Defendant on that claim. But she maintained—and we agree—that she'd adduced sufficient evidence for her claim of *constructive* notice. Carnival also contends that any defect to the threshold was open and obvious—a proposition with which Rondon rightly disagrees. Finally, Rondon argues that her fall caused a full tear to two *other* rotator-cuff tendons—her right and left supraspinatus. *See* Day 1 Trial Tr. [ECF No. 112] at 24:15–20; Day 3 Trial Tr. [ECF No. 114] at 527:06–13; Day 4 Trial Tr. [ECF No. 115] at 713:22–714:08. Here, we agree with the Defendant that, more likely than not, Rondon had been suffering from tears to these two tendons for many months (or even years) before she fell. *See* Day 7 Trial Tr. at 1143:21–1144:09.

In her Complaint, Rondon asserted four counts against Carnival: negligent maintenance (Count I); negligent failure to warn (Count II); negligent training (Count III); and negligent design, construction, and selection of materials (Count IV). *See generally* Compl. [ECF No. 1]. That Complaint had suggested that Rondon tripped and fell when the threshold became "loose." *Id.* ¶ 13. As we'll see, however, Rondon abandoned this claim at trial and argued instead that the threshold had been improperly "install[ed]" and "maintain[ed]," causing a hazardous condition Carnival never warned its passengers about. *Id.* at 4. Specifically, she now claims that the threshold created a "large gap" on the

---

[1] There's "no claim" for attorneys' fees. *See* Joint Pretrial Stip. [ECF No. 65] at 5.

"latch side of the doorway" between the carpet and the threshold. *See* Joint Pretrial Stip. at 1 [ECF No. 65]. This, then, became the central disputed liability issue at trial.

After careful review, we find that the threshold *did* create a hazardous condition about which Carnival could (and should) have known. We also find that the defect *wasn't* open or obvious to passengers—even though it *probably* was known to Carnival's crew. At the same time, we find the Plaintiff's request for damages ridiculously overblown. She was injured in the fall, to be sure. But the evidence supports Carnival's view that her injuries are far more limited than she claims—and that she's mostly recovered from her injuries in any event. So, while Rondon *is* entitled to damages, we'll award her only a fraction of what she's requested.

## THE LAW

But before we get into all that, we'll briefly outline the law that applies to all four of Rondon's claims. "Maritime law governs actions arising from alleged torts committed aboard a ship sailing in navigable waters." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Misener Marine Const., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 838 (11th Cir. 2010) (quoting *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65 (1986)). In the absence of an established federal maritime rule, we "may borrow from a variety of sources in establishing common law admiralty rules to govern maritime liability where deemed appropriate." *Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (applying the "general common law and in particular the Restatement (Second) of Torts" to "determine the law of maritime trespass"); *see also Wells v. Liddy*, 186 F.3d 505, 525 (4th Cir. 1999) (collecting cases). The "general maritime law may be supplemented by either state law or more general common law principles." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020)

(cleaned up). For maritime-tort cases, "we rely on general principles of negligence law." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (cleaned up).

A cruise line "is not liable to passengers as an insurer," but instead liable to passengers "only for its negligence." *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) (cleaned up). "The elements of a maritime negligence claim, in turn, are well-established, and stem from general principles of tort law." *Tesoriero*, 965 F.3d at 1178. A cruise passenger must show that "(1) the defendant had a duty to protect the plaintiff from a particular injury, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual harm." *Guevara*, 920 F.3d at 720 (quoting *Chaparro*, 693 F.3d at 1336).

But "[t]he mere fact that an accident occurred does not give rise to a presumption of a dangerous [*viz.*, risk-creating] condition[.]" *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1237 (S.D. Fla. 2006) (Moreno, J.) (first citing *Clyde Bar, Inc. v. McClamma*, 10 So. 2d 916, 916–17 (Fla. 1943); and then citing *Winn Dixie Stores, Inc. v. White*, 675 So. 2d 702, 703 (Fla. 4th DCA 1996)). Instead, shipowners owe their passengers a duty of "ordinary reasonable care under the circumstances." *Keefe*, 867 F.2d at 1322. This standard requires, "as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition," at least so long as "the menace is one commonly encountered on land [as here] and not clearly linked to nautical adventure." *Ibid.*; *see also Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990). In other words, the cruise operator must have known "'or should have known' about the dangerous condition." *Guevara*, 920 F.3d at 720 (quoting *Keefe*, 867 F.2d at 1322).

One more thing. Negligent training occurs when an employer was negligent in the "implementation or operation of [a] training program." *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005). It's "well settled that general maritime law does not recognize a claim of negligence that is premised upon a company's general policies and operations." *Quashen v. Carnival Corp.*, 576 F.

Supp. 3d 1275, 1297 (S.D. Fla. 2021) (Moore, J.). Here, Carnival's corporate representative, Rolando Diaz, testified that, as a regular part of their duties, Carnival's cleaning crews were "trained" to "look for" and "report" anything "wrong" with the thresholds. Day 1 Trial Tr. at 161:19–24. As we'll see, however, none of these cleaning crews reported a gap in the subject threshold that was large enough to impede the progress of a cleaning cart as it passed over the threshold. So, at least as to the cleaning crews, there *was* a specific "training program" Carnival failed to implement or operate properly. *Mercado*, 407 F.3d at 1162.

## THE TRIAL EVIDENCE

### I.   Liability

As we've said, by the time we completed the trial, the parties had agreed on all but three liability issues: (1) whether the threshold was defective and dangerous; (2) if it was defective and dangerous, whether Carnival had constructive notice of the danger; and (3) again, assuming that the threshold was dangerous, whether the danger was open and obvious. Having carefully reviewed all the evidence, we resolve all three issues in favor of the Plaintiff.

### A.   The Threshold Was Dangerous

Starting with the threshold, we find that it *was* dangerous.

The threshold is a metal plate that straddles a fire-safety doorframe. As the Plaintiff's first liability expert, George Melchior, explained, the fire-safety doorframe *itself* was correctly constructed. *See* Day 2 Trial Tr. [ECF No. 113] at 309:17–24. In other words, all four of its sides met at "90-degree" angles. *Id.* at 309:19. But the frame was then *installed* at a slight "0.6%" angle. *Id.* at 245:15–24. So, it rose to the "right" towards the "latch jamb" instead of sitting flush with the floor. *Id.* at 246:14–19. Installing the doorframe at this angle caused the bottom of the frame to remain slightly "askew." *Id.* at 245:21–24. When workers went to install a metal plate (our threshold) to cover the bottom of that frame, the plate necessarily rose slightly on the right side to match the frame's skew. *See id.* at 245:15–

20. This caused an abrupt elevation change (a gap) between the carpet and the threshold on the right side. That gap was located (again) towards the "latch" jamb and was situated on the right side of the hallway—on the part of the threshold that faces Rondon's cabin. *Id.* at 245:10–20.

This abrupt elevation change violates *most* of the walkway-safety standards the parties discussed at trial. As we'll see, all but one of these standards recommend that *any* abrupt elevation change measure less than 0.25 inches. *See id.* at 273:19–274:07. Any more than that, the standards say, and a "bevel" or ramp should be installed. *Id.* at 274:01–04. But 0.25 inches is *less* than the highest elevation change *the defense's own* liability expert, Elisabeth Anderson, measured when she inspected the subject threshold. *See* Day 6 Trial Tr. [ECF No. 117] at 984:24–985:01. To be precise, the highest elevation change Anderson measured on that threshold was "0.255 inches"—*more* than a quarter inch. *Id.* at 985:01. And no "bevel" or ramp was installed there. *Id.* at 1013:10–19.

Carnival counters that the Plaintiff's proffered standards are "inapplicable," Day 1 Trial Tr. at 39:14–18, because they're *either* "voluntary" and consensus-based (*e.g.*, the Advancing Standards Transforming Markets International ("ASTM") 1637 Standard for Safe Walking Surfaces), Day 6 Trial Tr. at 1025:07–11, *or* not yet promulgated as "rules" (*e.g.*, the Americans with Disabilities Act ("ADA") standards for safe walkways in buildings or landside structures, which are "proposed" for passenger vessels but not yet adopted), *id.* at 1026:08–1027:08. But that's neither here nor there. For one thing, as we'll see, the defense's proposed standard is *likewise* not binding. For another, whether the standards "must" be followed is the wrong question. The standards *cannot* set the standard for dangerousness—they're merely *evidence* of whether the threshold was dangerous. *See Thompson v. Wal-Mart Stores E., L.P.*, 2022 WL 59678, at *6 n.7 (S.D. Fla. Jan. 6, 2022) (Altman, J.) ("[The defendant's] policies—while they don't fix the standard of care in a negligence action—can be relevant to the fact-finder's determination of what that standard of care might be." (citing *Mayo v. Publix Super Markets, Inc.*, 686 So. 2d 801, 802 (Fla. 4th DCA 1997) ("We clarify that a party's own internal operating manuals are admissible if

relevant to the issues raised. We reiterate, however . . . that a party's internal rule does not itself fix the legal standard of care in a negligence action[.]"))); *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1282 (11th Cir. 2015) ("[E]vidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence." (cleaned up)); *RLI Ins. Co. v. Alfonso*, 2021 WL 430720, at *18 (S.D. Fla. Feb. 8, 2021) (Altman, J.) (noting that the defendant "could have argued that [ ] failure to comply with that standard evidenced its negligence" (citing *Sorrels*, 796 F.3d at 1282 ("Compliance or noncompliance with such custom, though not conclusive on the issue of negligence, is one of the factors the trier of fact may consider in applying the standard of care."))).

In the end, there appears to be a clear consensus across industries and organizations that abrupt elevation changes of more than 0.25 inches for walkways are unsafe. And that consensus is good evidence that there's a minimum standard for walkway safety, which Carnival's threshold failed to meet.

The one standard the defense introduced is mostly inapposite here. That standard is the International Maritime Organization ("IMO") "circular" standard. Day 6 Trial Tr. at 987:06–18. According to Anderson, the IMO standard allows for abrupt elevation changes of up to "1.18 inches"—a change far *more* abrupt than any found here. *Id.* at 987:21–988:01. But the IMO standard is irrelevant to cruise ships because it applies to "Ro-Ro" (or Roll On/Roll-Off) vessels, *id.* at 988:16–17—*i.e.*, ships that carry rolling "cargo" like "cars" or "semitruck trailers" along with a few passengers, *id.* at 1017:25–1018.04. As Anderson admits, the *Celebration* isn't a Ro-Ro ship, so the IMO standard "does not" apply. *Id.* at 1018:05–13. And that makes sense. Ro-Ro vessels aren't intended to carry thousands of passengers—many of them elderly, disabled, or intoxicated. They carry mostly cargo, so they don't need to be as safe for walking as cruise ships are. At any rate, as we've said, this single, outlier standard cannot set the standard for dangerousness—it's merely *evidence* of what the standard

might be. In the end, the Defendant's mostly-inapposite standard is plainly outweighed by the many standards the Plaintiff has cited, which suggest that the threshold's gap was higher than it should have been.

### B. The Danger Wasn't Open and Obvious

Because we find that the danger wasn't open and obvious, Carnival had a duty to warn Rondon. A cruise-ship operator has a duty to warn passengers only of "known dangers that are not open and obvious." *Frasca v. NCL (Bahamas) Ltd.*, 2016 WL 3553217, at *2 (11th Cir. June 30, 2016). Open and obvious dangers are "discernable through common sense and the ordinary use of eyesight." *Lugo v. Carnival Corp.*, 154 F. Supp. 3d 1341, 1345–46 (S.D. Fla. 2015) (Moore, C.J.). Courts "evaluate whether a danger would be open and obvious from an objectively reasonable person's point of view and do not focus on the plaintiff's subjective perspective." *Krug v. Celebrity Cruises, Inc.*, 745 F. App'x 863, 866 (11th Cir. 2018).

Here, the danger *wasn't* open and obvious. The problem is most prominent on the right part of the plate on one side—one tiny section. Of all the many people who traversed the hallway and walked over the threshold, *no one* reported (or even noticed) the defect. *See* Day 1 Trial Tr. at 159:07–25, 161:03–163:10, 165:16–22 (no employee work orders or reports); Day 2 Trial Tr. at 323:06–10 (no passenger prior incident reports involving "the same exact" threshold). Even the Plaintiff and her daughter, who both tripped over the threshold, *see* Day 5 Trial Tr. [ECF No. 116] at 782:15–25 (the Plaintiff); Day 1 Trial Tr. at 170:06–172:23 (the Plaintiff's daughter), *didn't* notice the dangerous gap until *after* they tripped. That's because you wouldn't see the gap or notice it unless (1) you were lying on the floor and inspecting it from that vantage, (2) you were tripping over that precise spot on the plate, or (3) you were trying to push a cart over that spot (more on this last point below). *See* Picture of Threshold from the Plaintiff's second liability expert Dr. Srinivas Kadiyala's August 25, 2024, Inspection, Joint Ex. 155.0111 [ECF No. 95-1] at 111 (showing the gap from a floor view). Indeed,

Carnival safety officer Francesco Tiberti testified that he didn't, and *still* doesn't, see a gap there, *see* Day 1 Trial Tr. at 76:03–11; *id.* at 94:20–23; *id.* at 95:21–97:08; *id.* at 102:01–23—this despite the fact that *both* the Plaintiff's *and the Defendant's* experts identified the gap and measured its contours, *see* Day 2 Trial Tr. at 243:25–244:09; *id.* at 245:10–20; *id.* at 249:19–250:06; *id.* at 350:11–19; *id.* at 353:18–21; *id.* at 369:18–371:12; *id.* at 372:11–15; Day 6 Trial Tr. at 984:11–985:01.[2] To be clear, Tiberti wasn't lying. His testimony makes sense: He wouldn't have seen the gap because he never laid down on the floor next to the threshold to inspect it.

### C. Carnival Had Constructive Notice

Finally, we find that Carnival *was* on constructive notice of the threshold's dangerous condition. Constructive notice can be shown in at least two ways. *First*, a plaintiff can establish constructive notice by showing that a "defective condition existed for a sufficient period of time to invite corrective measures." *Keefe*, 867 F.2d at 1322 (cleaned up). *Second*, a plaintiff can show evidence of "substantially similar incidents in which conditions substantially similar to the occurrence in question must have caused the prior accident." *Ibid.* (cleaned up).

#### 1. No Substantially Similar Incidents

Let's start with substantially similar issues. Rondon adduced some evidence that eight *other* passengers had tripped over *other* thresholds *either* on the *Celebration* or on a sister ship, the *Mardi Gras*, in the two years leading up to Rondon's fall. *See* Pl.'s Exs. 28–35 ("Passenger Injury Statements") [ECF Nos. 91-1–8]; *see also, e.g.*, Day 1 Trial Tr. at 135:16–156:09. But this generalized evidence reveals *only* that people sometimes trip over thresholds (not a shocker); it doesn't show that Carnival was on notice of *our* danger—a threshold that was dangerous only because it was placed over a fire-safety doorframe

---

[2] One point of clarification. We're calling Dr. Kadiyala the Plaintiff's second liability expert because that's how the Plaintiff disclosed him. *See* Pl.'s Witness List [ECF No. 65-1] at 3. But, at trial, Dr. Kadiyala testified *only* as a fact witness about his observations aboard the *Celebration*. *See* Day 2 Trial Tr. at 350:20–352:18.

that was *itself* installed at a 0.6% skew in one direction. *Cf. Keefe*, 867 F.2d at 1322 ("[The defendant] BCL's liability thus hinges on whether it knew or should have known about the treacherous wet spot. Although the trial court did find that the dance floor was slippery and sticky on the night of the accident, and that passengers patronizing the nearby bar frequently ferried drinks across the dance floor, giving rise to an inference that a spilled drink may have created the slippery spot encountered by [the plaintiff] Keefe, the district court made no express finding as to how long the particular unsafe condition at issue here existed prior to Keefe's mishap."); *see also Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 172 (2d Cir. 1983) (holding that the cruise line needed to have notice of the danger posed by the *specific* stool the cruise passenger tripped over); *Everett*, 912 F.2d at 1358 (holding that the cruise line needed to have notice of the danger posed by the *specific* threshold the cruise passenger tripped over).

### 2. Enough Time for Corrective Measures

Even so, in three ways, Rondon has shown that the "defective condition existed for a sufficient period of time to invite corrective measures." *Keefe*, 867 F.2d at 1322 (cleaned up). *First*, Carnival workers pushed carts over the threshold many times a day. At least one of these workers should've noticed the gap in the "six months" or so between the *Celebration*'s maiden voyage and Rondon's accident. Day 2 Trial Tr. at 295:20–23. Indeed, Dr. Kadiyala testified that, during his inspection, which lasted less than a day, he witnessed *several* Carnival workers pushing "luggage" and "food delivery" carts over the threshold to and from a "utility" room. *Id.* at 389:16–391:10. In that short period of time, Dr. Kadiyala even watched a cart get stuck *on the subject threshold* coming from the *precise* "direction of Ms. Rondon's walking[.]" *Id.* at 391:02–12; *see also* Photo from Aug. 25, 2024, Dr. Kadiyala Inspection, Joint Ex. 155.0158 [ECF No. 120-2] (depicting the cart Dr. Kadiyala testified he observed getting stuck on the subject threshold). When the worker tried to push the cart over the metal plate, Dr. Kadiyala testified, the cart "stopped[.]" Day 2 Trial Tr. at 391:02–07. To get the cart over the threshold, the worker had to "to pull it back, move it towards the edge, that is[,] the hinge side, and

then pull it over the top" of the threshold. *Ibid.*; *see also* Photo from Aug. 25, 2024, Dr. Kadiyala Inspection.

True, this was *after* Rondon's accident. But the evidence was uncontested that Carnival employees have pushed all kinds of carts over this threshold several times a day *every single day* since the ship's maiden voyage. *See* Day 2 Trial Tr. at 388:07–16 ("[Rondon's counsel]: Did you observe carts—some sort of carts moving in and out of that area when you were there doing your inspection? [Dr. Kadiyala]: Yes, sir. I observed luggage carts and what looks like food delivery carts. Q. Full what carts? A. Food delivery carts. Q. Oh, food delivery carts. Okay. And who was pushing these carts? A. There were crew members pushing these carts."). Since the dangerous condition (the gap) existed because of the improper way in which the threshold itself was installed—and given Dr. Kadiyala's testimony that a cart being pushed over *that side* of the threshold *would* get stuck—we think it reasonable to infer that carts have been getting stuck on that threshold ever since the ship was launched (long before Rondon's fall). And yet, no one said a word about it.

*Second*, Carnival's cleaning crews and safety officers likewise should've noticed and reported the gap, but they too were silent. Diaz testified that Carnival's housekeeping teams clean each fire-safety threshold "daily[.]" Day 1 Trial Tr. at 161:12–18. As part of their duties, the cleaning crews were trained to "look for" and "report" anything "wrong" with the thresholds. *Id.* at 161:19–24. What's more, Tiberti testified that Carnival's safety officers inspect and maintain the threshold on a "weekly," "monthly," tri-monthly, or yearly basis—depending on the type of inspection that's required. *Id.* at 74:22–75:04. All these employees were supposed to look for defects and had a duty to report those defects to Carnival "immediately." *Id.* at 83:17–24; *id.* at 84:05–11. Again, however, no one reported that the subject threshold had an elevated lip that caused carts to get stuck as they passed over it. *See id.* at 161:25–162:03 (revealing no "record" of any issues with the threshold).

11

*Third*, the danger was present for a significant amount of time before Rondon's accident—for about "six months" since the *Celebration* first set sail. Day 2 Trial Tr. at 324:08–09. Constructive notice, it's true, can't be imputed merely because Carnival, the shipowner, "created or maintained" the premises that contained the dangerous condition. *Everett*, 912 F.2d at 1358–59. But the Eleventh Circuit has found that much shorter periods of time—as "short as ten minutes" in fact—were long enough to put a defendant on constructive notice of the dangerous condition. *See Torres v. Wal-Mart Stores E., L.P.*, 555 F. Supp. 3d 1276, 1283 (S.D. Fla. 2021) (Altman, J.) (first citing *Lebron v. Royal Caribbean Cruises Ltd.*, 818 F. App'x 918, 922 (11th Cir. 2020) (reversing directed verdict on issue of constructive notice where the "unsafe condition existed for at least ten minutes"); and then citing *D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 798 (11th Cir. 2019) (reversing summary judgment and finding that "eighteen minutes was a sufficient period to present a genuine issue of material fact" on question of constructive notice)). For all these reasons, we find that Carnival had constructive notice of the threshold's dangerous condition.

## II. Damages

Now that we've established Carnival's liability, we must determine Rondon's damages. She requests (1) economic damages (only medical expenses), *see* Pl.'s Prop. Find. of Fact and Concl. of Law ¶ 133; and (2) non-economic damages for "pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience and loss of capacity for the enjoyment of life," *id.* ¶ 136; Compl. ¶¶ 15, 29, 36, 46, 56 (same). "[G]eneral compensatory damages" like the ones Rondon requests "need not be proved with a high degree of specificity." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999) (cleaned up). Instead, they "may be inferred from the circumstances as well as proved by testimony." *Ibid.* The Eleventh Circuit has held that "the appropriate measure of medical damages in a maritime tort case is that reasonable value determined . . . upon consideration of any relevant evidence, including the amount billed, the amount paid, and any expert testimony and

other relevant evidence[.]" *Higgs v. Costa Crociere S.p.A. Co.*, 969 F.3d 1295, 1299 (11th Cir. 2020). And it's "well-established under Florida law that in tort actions alleging a physical injury . . . lay testimony from a personal injury claimant is sufficient to show mental anguish, loss of enjoyment for life, or other noneconomic damages." *Button v. Royal Caribbean Cruises, Ltd.*, 2013 WL 12064491, at *2 (S.D. Fla. July 23, 2013) (Ungaro, J.) (collecting cases). Of course, a plaintiff can only recover for injuries that were proximately caused by the defendant's breach of the duty of care. *See Phillips v. Delta Air Lines, Inc.*, 2022 WL 3571029, at *1 (11th Cir. 2022).

### A. No Compensation for Supraspinatus Tendon Tears

Rondon undoubtedly deserves *some* damages. The Defendant, after all, *agrees* that she suffered three sets of serious injuries from her fall: a fractured right arm; a dislocated right shoulder; and partial tears to two rotator-cuff tendons (the subscapularis and the infraspinatus). *See* Day 7 Trial Tr. at 1141:23–1142:13 ("[Carnival's counsel]: I think that if the Court was to find liability . . . we think that she suffered an injury to the right side, the fracture, the dislocation. There w[ere] partial tears to the subscapularis . . . and the infraspinatus. . . . Two partial tears. . . . [t]hat are likely acute."); *id.* at 1142:13–19 ("[Carnival's counsel]: And she probably suffered an aggravation of what was previously a well-compensated degenerative chronic supraspinatus tear [on her right side] that had retracted five centimeters over time. So that if the Court did find liability, we think that the right shoulder would be appropriate. But the left shoulder would still be not causally related here."). Nor does Carnival dispute that Rondon has received medical treatment for these injuries, that she struggles (and has struggled) with physical pain, and that she faces (and has faced) "limitations" in her daily routine. *Id.* at 1144:19–1147:02 ("[The Court]: She[ ] still suffers significant pain and has significant limitations thereafter. Don't you think? Doesn't that seem clear? Or are we disputing that? [Carnival Counsel]: [I]n terms of the limitations, . . . the testimony was clear that Ms. Rondon is still able to do most of the things that she was able to do before. . . . [W]e would submit that if the Court was to find liability against Carnival

for at least the right shoulder injury, . . . an appropriate amount to reasonably compensate her for the right shoulder would be the past medical expenses plus another $71,000 in pain and suffering. . . . [T]hat's the total number to compensate her for the past and the future[.]"). The real question we must decide today, then, is whether the two full tears the doctors observed in Rondon's *other* rotator-cuff tendons—the supraspinatus tendons in her right *and* left shoulders—were *also* caused by the fall. On *this* issue, each side offered the testimony of a retained orthopedic surgeon: Dr. Dominic Lewis for the Plaintiff; and Dr. Cesar Ceballos for the defense. Dr. Lewis is a foot and ankle surgeon who hasn't "operated on a shoulder" or "performed a rotator cuff surgery" in "18" or "19" years—since he was "in training." *Id.* at 1092:02–05. Dr. Ceballos is a shoulder surgeon who treats rotator cuffs, operates on shoulders "on a weekly basis," and performed "four" shoulder surgeries in just the week before his testimony in this case. Day 6 Trial Tr. at 888:23–889:05. Between the two, we rely more heavily on Dr. Ceballos's opinions—mainly because he regularly operates on (and inspects) shoulders, whereas Dr. Lewis does not. In the end, based on all the evidence we reviewed, we agree with Dr. Ceballos's opinion that Rondon's supraspinatus tears were more likely than not chronic—though the fall undoubtedly "aggravated" a preexisting tear to her right supraspinatus tendon. *Id.* at 894:20–24.

Rondon, of course, insists that *both* of her supraspinatus tendons tore during her fall. *See* Day 4 Trial Tr. at 685:05–686:05; *id.* at 713:22–714:08. And these tears (she says) required *two* shoulder-replacement surgeries, which (in her view) Carnival should pay for. *See id.* at 717:12–18. For three reasons, we disagree. *First*, as Dr. Ceballos credibly explained, the high degree of tendon "retraction" in these tears supports their chronicity. Day 6 Trial Tr. at 896:05–08. Imaging conducted *after* Rondon's fall revealed that *both* supraspinatus tendons were retracted five centimeters from the bone to which they were supposed to connect. *See id.* at 900:10–17; *id.* at 919:01–16. Dr. Ceballos testified that this degree of retraction—five centimeters—"doesn't happen" in a "traumatic acute" tear. *Id.* at 895:09–

13. Indeed, in his "20-plus years working as an orthopedic surgeon," he's "never seen it"—principally because it "takes years for an isolated tear to retract that far back." *Id.* at 895:09–15.[3]

*Second*, Rondon's surgical findings show the "significant degeneration" and "atrophy" one would expect to see in "chronic," not acute, tears. *Id.* at 904:13–20. These findings were plainly visible in *both* shoulders. *See ibid.* (discussing the surgical findings for the Plaintiff's right rotator cuff); *id.* at 920:03–11 ("similar" findings for the left rotator cuff); *see also* Day 4 Trial Tr. at 733:18–735:01 (Dr. Lewis (Rondon's expert) agreeing that "tissue atrophy" would be a "sign of a chronic, long-standing tear" and conceding that Rondon's surgical findings report "significant degeneration and atrophy" in her left rotator cuff.). True, those two findings *weren't* visible on Rondon's MRIs. *See* Day 6 Trial Tr. at 899:21–903:01; *id.* at 919:01–920:17. But the lower resolution of those MRIs—1.5 Tesla versus 3.0—wouldn't necessarily have revealed the level of atrophy and fatty-tissue intrusion that was *undeniably* present when Rondon went under the knife. *See id.* at 902:16–20 ("[Dr. Ceballos]: So even if there is a little bit of atrophy, . . . you can miss it on an MRI of this [1.5 Tesla] quality. [The Court]: You're saying because it's not a 3.5 [sic] Tesla? [Dr. Ceballos]: Yeah, it's not a high-quality MRI."); *id.* at 904:16–18 ("[Dr. Ceballos]: During the time of surgery, [the treating surgeon, Dr. Dillonelijah Arango] found that she had a torn rotator cuff with poor tissue and significant degeneration and atrophy."); *id.* at 920:08–11 ("[Dr. Ceballos]: [The left shoulder surgical findings were] similar to the other—to the right shoulder. During his examination under anesthesia and subsequent findings, surgical findings, he found that the [left] tendon was of poor quality with degeneration and atrophy."). We'd be remiss if we didn't add here that Rondon's own expert, Dr. Lewis, *admitted* that the

---

[3] There was *also* evidence that Rondon had been suffering from *right* shoulder pain for a long time. After all, *both* Rondon *and* her daughter testified that Rondon had hurt her right shoulder throwing out garbage months before her accident. *See* Day 1 Trial Tr. at 191:01–24; Day 3 Trial Tr. at 610:19–611:07. And *that* garbage incident was serious enough that Rondon's son-in-law had to drive her to the emergency room. *See* Day 1 Trial Tr. at 192:01–03; Day 3 Trial Tr. at 611:08–25.

displacement of her left shoulder, her "high-riding" humeral head, would've taken "decades" or at least "years" to develop. Day 4 Trial Tr. at 749:08–750:05; *id.* at 732:01–23; *id.* at 751:11–752:04 (admitting on re-cross his prior testimony that a "high-riding humeral head" was "probably a patient having a tear for decades-type thing").[4]

*Third*, there's *another* shoulder surgeon who seems to agree with Dr. Ceballos about the chronicity of a five-centimeter shoulder retraction. As we've discussed, Rondon's damages expert—Dr. Lewis—*isn't* a shoulder surgeon at all; he primarily operates on ankles. But his business partner, Dr. Richard Rosenscwaig, *is* an "expert in" and "specializes in" shoulder surgery. Day 7 Trial Tr. at 1087:17–1088:05. And Dr. Rosenscwaig testified in a 2023 cruise-ship tort trial in federal court that a rotator-cuff tear "from back in 2007"—that is, from many years earlier—"*would* have already retracted," just as Rondon's had by the time her shoulders were imaged. Day 2 Trial Tr., *Ruggeri v. NCL (Bahamas) LTD*, No. 20-cv-21961 (S.D. Fla. Nov. 7, 2023) (Gayles, J.), ECF No. 193 at 54:09–14 (emphasis added). In the end, then, we agree with Dr. Ceballos (and Carnival) that, more likely than not, Rondon's supraspinatus tears were chronic—and, therefore, were *not* caused by her fall.[5]

Putting aside the chronicity of these tears, though, we don't think Rondon injured her *left* shoulder *at all* in this fall. For one thing, the video of the fall shows Rondon lifting her left shoulder,

---

[4] On re-redirect, it's true, Rondon's lawyer tried to salvage this point by getting Dr. Lewis to say that the high-riding humeral head *could've* developed in the "17" or so months between Rondon's accident and the pre-surgery imaging of her left shoulder. Day 4 Trial Tr. at 752:14–16. But we didn't find this part of Dr. Lewis's testimony all that credible given his earlier statement—corroborated by Dr. Ceballos—that a high-riding humeral head was "probably a patient having a tear for decades[.]" *Id.* at 751:24–25.

[5] Just to be complete here, we'll note that Rondon initially claimed several *other* injuries we needn't address here. In her Complaint, for instance, she alleged that she'd suffered a "concussion" and "right knee" injury. Compl. ¶ 15. Even as late as the start of trial, she claimed a "trigger finger" injury she'd never mentioned in her Complaint. Day 1 at 29:06–08. By the end of trial, however, Rondon had abandoned these claims—and so, without opposition from Rondon, we entered a verdict for Carnival on this part of her case. *See* Day 7 Trial Tr. at 1080:18–1081:08 (Rondon withdrawing her request for damages for any injuries to her "index finger," "knee," and "head").

without pain or limitation, *immediately after* the fall. *See* Carnival's CCTV Footage of the Fall; Day 6 Trial Tr. at 915:23–916:14 ("[Carnival's counsel]: [W]as there anything you saw on the CCTV video that supports—or that you used to support your opinion as to the left shoulder injuries? [Dr. Ceballos]: I saw the fall, but then I saw her sitting down attending to her right shoulder, grabbing a large bottle [with her left arm], a lot larger than this one, about 75 percent full of water, and bringing it up here to drink [indicating]. There's no way you can do that—it's impossible to do that if you have an acute tear that just happened, such a large tear that's retracted five centimeters. There's no way you can do that, unless it's been there for a long time and you have a well-compensated shoulder. [The Court]: That's of the supraspinatus? [Dr. Ceballos]: Yes."). For another, Dr. Arango's testimony (and Rondon's medical records) reveal that Rondon didn't reported *any pain* in her left shoulder until months later. *See* Day 3 Trial Tr. at 552:20–23 ("[Carnival's counsel]: And you noted that during that [June 7, 2023] initial visit, Ms. Rondon only complained of pain in her right shoulder, is that correct? [Dr. Arango]: From what I recall, yes."); *id.* at 523:10–16 ("[Rondon's counsel]: What did the patient present with at that time [the July 3, 2023, visit] and what did you find? [Dr. Arango]: So she was there for follow-up of her right shoulder, and she also had complaints of her left shoulder. Q. And what were the complaints of the left shoulder at that time? A. Pain and weakness."); June 7, 2023, Dr. Arango Visit Notes, Joint Ex. 188 [ECF No. 103-5] at 4 (noting "right," but not left, shoulder pain); July 3, 2023, Dr. Arango Visit Notes, Joint Ex. 188, at 1 (noting "pain" in the "[l]eft [s]houlder," too); Day 5 Trial Tr. at 865:19–21 ("[Carnival's counsel]: So you didn't report any pain in your left shoulder on that day, on May 13th, 2023. [Rondon]: No."). For yet another, Rondon's medical records show that she'd reported a history of bursitis, an inflammatory condition, in her left shoulder *before* her accident. *See* Jan. 2, 2023, Emergency Room Documentation, Joint Ex. 202 [ECF No. 107-2] at 40 ("In the ED, the patient notes that she has chronic left shoulder pain due to her bursitis, but denies having any new pains."); Day 3 Trial Tr. at 475:13–19 ("[Rondon's counsel]: Well, just to show that prior to this,

before this, she didn't have any problems with her left— [The Court]: She did have some problems. We saw some medical records. [Rondon's counsel]: Right. She had bursitis, no doubt about it, had bursitis a couple years before[.]"); Day 4 Trial Tr. at 730:17–23 ("[Carnival's counsel]: And you would agree with me that there was some evidence here of pre-existing degenerative changes to both of the plaintiff's shoulders, right? [Dr. Lewis]: Well, I would say it this way. There's one record that I'm aware of where—I believe it was a hospital record, where it mentioned that the patient had—as part of the review of systems, that the patient had left shoulder bursitis."); *but see* Jan. 2, 2023, Emergency Room Documentation at 12, 36, 38, 40, 47, 49, 52, 54, 145 (documenting a history of "bursitis" in the "right," not left, shoulder); July 26, 2022, Emergency Room Documentation, Joint Ex. 202, at 6, 33, 35–36, 55–56, 61, 76, 89 (same); Day 3 Trial Tr. at 459:08–11 ("[Rondon's counsel]: Did you ever make any statements in the hospital to anyone that your mother had any problems or bursitis with her left shoulder? [Rondon's daughter]: No, I did not.").

Taken together, this is all strong evidence that *both* of Rondon's supraspinatus tears—but especially the one in her left shoulder—were chronic.

**B. The Amount of Rondon's Damages**

We'll calculate *the amount* of Rondon's damages in two steps: *first*, by computing the amount of her past and future compensatory damages (including medical expenses, pain and suffering, etc.); and *second*, by determining whether she's entitled to pre-judgment interest.

**1. Compensatory Damages**

**a. Medical Expenses**

Starting with medical expenses, the parties have stipulated to an amount of $58,102.48 in "total" past medical expenses—a figure that equals the amount of a medical lien for the treatment

Rondon received on both shoulders. Joint Trial Stip. at 2. But the fall only caused injuries to Rondon's right shoulder. So, we'll limit our past expense award to half of that lien (or $29,051.24).[6]

We also conclude that Rondon probably won't need a second right shoulder replacement. Rondon introduced records from the Social Security Administration, *see* Actuarial Life Table, Pl.'s Ex. 257 [ECF No. 108-19] at 3, showing that her natural life expectancy is 83.86 years—or "22.86 years" from now, Day 1 Trial Tr. at 51:24–52:17; Actuarial Life Table at 3. And Dr. Ceballos testified that her right shoulder replacement should last her "20 to 25 years . . . at least[.]" Day 6 Trial Tr. at 922:09–12. At that point, Dr. Ceballos was clear, Rondon will be "into her 80s" and would be a very "unlikely" candidate for a late-stage right shoulder replacement—with only a few years (at most) remaining on her natural life expectancy. *Id.* at 922:09–15; *see also id.* at 922:04–15 ("[Carnival's counsel]: Dr. Ceballos, do you have any opinions on whether Ms. Rondon is likely to require any future surgery to her left or her right shoulder? . . . [Dr. Ceballos]: It's unlikely. Nowadays the implants are lasting— even the knee and hip implants, which we overload and we walk on our legs, they're lasting 20 to 25 years now. So I expect the shoulder implant to last just at least that much. We don't walk on our hands. So she's—I believe she's 61 now, 60 or 61. So that shoulder should last her into her 80s, both shoulders."). Dr. Lewis didn't really disagree with most of this. *See* Day 4 Trial Tr. at 738:07–11 ("[Carnival's counsel]: At your deposition, you told me that one could reasonably hope for [the shoulder replacement] to last as long as 20 years, is that fair? [Dr. Lewis]: [T]he number people generally use is 15 plus or minus five. So 10 to 20 years[.]"); *id.* at 738:14–23 ("[The Court]: Assuming that the patient has a life span of 22 years, and the shoulder lasts, let's say, 20 years. On the question of whether to operate on a person two years from the end of their expected life span . . . we're not

---

[6] If the parties feel that the past-medicals award should be somewhat different, they may file a motion for reconsideration, spelling out *exactly* what they believe the number should be given the factual findings we've made in this Order. Before filing any such motion, though, the parties must consult with each another and try to reach agreement on the final number.

going to put the person's body through this thing, right? [Dr. Lewis]: Yes. You know, but, yes, and that is patient specific."). So, we don't think it makes sense to award Rondon *any damages* for a future right shoulder replacement she's very unlikely to need.[7]

### b.  Non-Economic Damages

Rondon and her daughter offered extensive testimony about the different ways in which Rondon's quality of life has deteriorated since her injury. She cannot clean around the house as well as she once did, *see* Day 3 Trial Tr. at 490:05–13; Day 5 Trial Tr. at 832:15–19, 833:01–23; she cannot make Cuban coffee or cook for her family like she did before, *see* Day 3 Trial Tr. at 582:17–583:08, 587:23–588:05; Day 5 Trial Tr. at 835:09–18, 847:05–07; she can no longer run alongside her grandchildren as they skate outside, *see* Day 3 Trial Tr. at 579:01–17; Day 5 Trial Tr. at 832:15–19; she has difficulty bathing and dressing herself, *see* Day 3 Trial Tr. at 490:22–491:15; Day 5 Trial Tr. at 837:02–06, 849:10–21; she's often in pain, *see* Day 3 Trial Tr. at 491:16–492:02; Day 5 Trial Tr. at 833:24–836:23; she doesn't sleep well and, especially before her surgery, had to sleep sitting up in a sofa chair, *see* Day 5 Trial Tr. at 807:05–809:22; and she's embarrassed about the size and look of her scarring, *see id.* at 851:02–19.

All but the last of these were far more pronounced *before* her surgeries than after. *See* Day 3 Trial Tr. at 578:11–12 ("[Rondon's daughter]: So my mom mentions when she has pains, but recently, after the last surgeries, being mostly the left shoulder."); *id.* at 581:21–24 ("[Rondon's daughter]: [W]hat we have been trying to do after all of this surgery, seeing that she's unable to do most of these things, is trying to facilitate her [to] do things that she used to do."); Day 5 Trial Tr. at 807:20–808:03

---

[7] Rondon also sought compensation for "psychological" and "household" expenses as part of her "economic damages[.]" Compl. ¶¶ 15, 29, 36, 46, 56. But, before trial, the parties stipulated that, while Rondon's economic damages "remain[ed] to be litigated at trial," they were "limited to past and future medical expenses." Joint Pretrial Stip. at 3–4. We therefore enter a verdict for Carnival on this part of the case, too.

(discussing Rondon's sleep disturbances before her right shoulder surgery); *id.* at 814:19–23 ("[Rondon's counsel]: What's the pain level after the four weeks in the right shoulder? [Rondon]: It was not as intense after the surgery[.]"); *id.* at 815:19–25 (Rondon testifying that she has "diminished" and only "occasional" pain since the surgery).

And that makes sense. Her right shoulder has been replaced, *see* Day 6 Trial Tr. at 910:08–911:25—the procedure *all three doctors*[8] agreed was the appropriate way to alleviate her pain and increase her range of motion, *see* Day 4 Trial Tr. at 709:10–14 ("[Dr. Lewis]: The point of surgery should be to improve pain and function. [The Court]: Did the surgeon do a good job? [Dr. Lewis]: Based on the x-rays I saw and the examination, I think, yeah."); Day 3 Trial Tr. at 534:06–11 ("[Dr. Arango]: I advised her that I felt that the rotator cuff tear was too large and retracted to be fixed with minimally invasive arthroscopic surgery. And so I felt the best indicated surgery for her would be a reverse shoulder replacement. [Rondon's counsel]: When you say that, which shoulder, or both? A. Right shoulder."); Day 6 Trial Tr. at 910:08–13 ("[Carnival's counsel]: Doctor, did you arrive at any opinions or conclusions regarding the reasonableness of the surgery performed on Ms. Rondon's right shoulder? . . . . [Dr. Ceballos]: It was reasonable, yes.").

She's also undergone extensive physical therapy. *See* Day 5 Trial Tr. at 817:25–818:09 ("[Rondon's counsel]: After this surgery on the right shoulder, did you go to physical therapy? [Rondon]: Yes. Q. The records show that you went to physical therapy from December 20, 2023, to June 7, 2024, 25 times. Does that sound accurate? A. Correct. Q. The records also show that you went to physical therapy five times before this surgery. Does that sound accurate? A. Correct."); *id.* at 840:03–842:25 ("[Rondon's counsel]: After the surgery on the left shoulder, I have 17 sessions through February of this year. Does that sound accurate? [Rondon]: It should be in my record. . . . In February,

---

[8] Dr. Lewis, Dr. Ceballos, and the treating physician, Dr. Arango. *See generally* Day 3 Trial Tr. (Dr. Arango testifying about Rondon's treatment).

it was the last therapy that I went, . . . and I was not able to finish because the insurance did not approve it.").

And she's adjusting to her limitations. *See* Day 6 Trial Tr. at 1037:08–12 (testifying that her daughter bought her "electrical" appliances to assist with household chores); *id.* at 1037:15–18 (testifying that family members now help her grab items from the higher kitchen shelves).

Plus, *all three doctors* made clear that she's reached "maximum medical improvement" on her right shoulder—by which they mean that they "don't think there's any treatment that [they] can do that's going to make [her] any better[.]" Day 3 Trial Tr. at 562:09–16; *see id.* at 562:17–563:04 ("[Carnival's counsel]: And would you agree that Ms. Rondon is at maximum medical improvement at this point as it relates to her injury to her right shoulder and the surgery that you performed? . . . The last note we saw we showed you [sic] that other note from a few months earlier before where she reported being happy in terms of the outcome of the operation, reported good range of motion and good strength, is that correct, Doctor? [Dr. Arango]: Yeah. If that was the last time I saw her, then I would say she's—does have a [sic] follow-up with me as needed."); *see* Day 4 Trial Tr. at 739:11–15 ("[Carnival's counsel]: And when you saw Ms. Rondon on January of 2025, of this year, I believe you told me at deposition that she was basically at maximum medical improvement as it related to her right shoulder at that time, is that correct? [Dr. Lewis]: Yes."); Day 6 Trial Tr. at 922:04–09 ("[Carnival's counsel]: Dr. Ceballos, do you have any opinions on whether Ms. Rondon is likely to require any future surgery to her left or her right shoulder? . . . [Dr. Ceballos]: It's unlikely."). And, while Dr. Lewis characterized Rondon as having lost "[t]wenty-nine" percent functionality in her arms, Day 4 Trial Tr. at 719:06, he agreed under questioning that this number made little sense and that "lawyers make us [expert witnesses]" compute "total loss" in a "kind of" "absurd way," *id.* at 719:05–18. Plus, while we agree that Rondon isn't the same person she was before the fall, we think it significant that, in her comments to Dr. Arango, she reported, *after* her surgery, that she was suffering

"no pain" in her shoulder. Day 3 Trial Tr. at 556:10–13; *see id.* at 556:03–13 ("[Carnival's counsel]: You noted that at that point in time, September 18th, 2024, Ms. Rondon was happy with the outcome as to the right shoulder surgery, right? [Dr. Arango]: Yes. Q. You noted right there in September 18th, 2024, she has no pain and is very good—I imagine it's [sic] has very good range of motion, is that fair? A. Yes.").

Balancing all this evidence, we'll award Rondon $100,000 per year for the pain and suffering, embarrassment, loss of enjoyment of life, mental anguish, scarring, disfigurement, physical impairment, and disability she endured over the *past two years*—for a total, *past* non-economic award of $200,000. Recognizing that Rondon will continue to suffer *some*—but far fewer—limitations from her fall as she ages, we'll award her $5,000 per year for *future* non-economic damages. Since Rondon is estimated to live an additional (approximately) 23 years, *see* Actuarial Life Table at 3 (calculating Rondon's remaining life expectancy as "22.86" years), this means we're giving her $115,000 for total, *future* non-economic damages.

***

Taking all these figures together, in short, Rondon is entitled to $344,051.24 in total compensatory damages.

### 2. Rondon Isn't Entitled to Pre-Judgment Interest

Rondon also asks for "all interest due under the applicable law including interest from the date of the subject incident under General Maritime Law[.]" Compl. ¶¶ 29, 36, 46, 56; *see also* Joint Stip. at 3 (stipulating that jurisdiction arises under the "General Maritime Law"). In her view, this includes interest on "non-economic damages from the date of the injury through the date on which the Final Judgment is entered." Pl.'s Prop. Find. of Fact and Concl. of Law ¶ 137. We won't be granting that.

"Personal injury plaintiffs are generally not entitled to prejudgment interest because the damages are uncertain and are not liquidated until determined by the jury." *Am. Dredging Co. v. Lambert*,

153 F.3d 1292, 1297 (11th Cir. 1998). At the same time, "[i]t is the general rule of this circuit to award pre-judgment interest in admiralty cases." *Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co.*, 338 F.3d 1276, 1280 (11th Cir. 2003). We think there's an obvious way to square these two lines of cases. There are, after all, many kinds of admiralty cases: cargo disputes, maritime contracts, and salvage and collision claims, to name a few. Personal-injury claims are thus just a small portion of the wider universe of admirability actions. So, while pre-judgment interest is generally available in those *other* types of admiralty cases—cases where damages *can* be accurately assessed at the moment the cause of action arose (*e.g.*, how much was owed on the marine policy, how much the contract was for, how much the boat was worth, etc.)—in personal-injury maritime cases, we can exercise our discretion *not* to award pre-judgment interest because the non-economic damages in particular are impossible to compute until a jury (or judge) tells us what those damages are. *See Lambert*, 153 F.3d at 1297. Here, Rondon's damages are just as uncertain as they would be in any other personal-injury case—the only difference being that she incurred those damages on a cruise ship rather than on shore. We think that's a difference without much significance.

Still resisting, Rondon insists that, "[u]nder the General Maritime Law which the Parties have stipulated applies to this case, interest is calculated on non-economic damages from the date of the injury through the date on which the Final Judgment is entered." Pl.'s Prop. Find. of Fact and Concl. of Law ¶ 137 (first citing *Culver v. Slater Boat Co.*, 688 F.2d 280, 311 (5th Cir. 1982) ("In those instances where the substantive law permits a court to award pre-judgment interest, the court must discount the damage figure back to the date of the event, i.e. injury or death, and may award pre-judgment interest for the period between the event and judgment."), *opinion withdrawn in part on reh'g*, 722 F.2d 114 (5th Cir. 1983); then citing *Sauers v. Alaska Barge & Transport, Inc.*, 600 F.2d 238, 248 (9th Cir. 1979) ("[R]ather than remanding this case for recalculation of the damages or recomputing the damages ourselves, . . . the interests of justice and the best interest of the parties require us instead to order the

award of prejudgment interest on the damage award, to be computed at an annual rate of 8% [c]ompounded annually from the date on which plaintiff filed its complaint[.]"); and then citing *Jones v. Carnival*, No. 04-cv-20407 (S.D. Fla Feb. 16, 2006) (Jordan, J.), ECF No. 220-1 at 1–3 ("In the exercise of my discretion, I believe that prejudgment interest should be awarded with respect to Ms. Jones' reduction in value of the cruise experience ($400), past lost wages and benefits ($7,000), lost value of past household services ($1,000), and past pain and suffering ($100,000).")); *see also Ruggeri v. NCL (Bahamas) Ltd.*, 2023 WL 8791089, at *1 n.1 (S.D. Fla. Dec. 18, 2023) (Gayles, J.) (awarding pre-judgment interest on past "non-economic damages" in a personal-injury admiralty case). But none of these (non-binding) cases address *Lambert*'s concern that, in personal-injury cases, "damages are uncertain and are not liquidated until determined by the jury." 153 F.3d at 1297. Nor do we find anything in Rondon's circumstances to distinguish her from the average personal-injury plaintiff who's "generally not entitled to prejudgment interest[.]" *Ibid*. We therefore won't award pre-judgment interest in this case.

## CONCLUSION

After careful review, then, we hereby **ORDER AND ADJUDGE** as follows:

1. On the claims of constructive notice, Final Judgment is **ENTERED** in favor of the Plaintiff, Vivian Ruiz Rondon, and against the Defendant, Carnival Corporation, on all four counts in the Complaint [ECF No. 1].

2. Final Judgment is **ENTERED** in favor of the Defendant on the Plaintiff's actual-notice claims; for any alleged injuries the Plaintiff failed to prove at trial, including the Plaintiff's alleged knee, trigger-finger, and head injuries; and for any economic harm that might be characterized as constituting psychological or household damages.

3. Pursuant to Federal Rule of Civil Procedure 58, we'll enter final judgment separately.

4. The Plaintiff is awarded damages against the Defendant in the amount of $344,051.24. That amount consists of $29,051.24 in past economic damages, $200,000 in past non-economic damages, and $115,000 in future non-economic damages. The Plaintiff's damages are limited to recovery for her fractured right arm and dislocated right shoulder; two partial tears to her right subscapularis and infraspinatus tendons; an aggravation of a pre-existing tear to her right supraspinatus tendon; and her pain, suffering, disability, physical impairment, scarring, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life. Pursuant to the parties' Joint Pretrial Stipulation [ECF No. 65], no attorneys' fees are awarded. Post-judgment interest shall accrue in accordance with 28 U.S.C. § 1961, from the date of entry of this Judgment until the Judgment Amount and all accrued interest are paid in full by the Defendant to the Plaintiff.

5. The Clerk of Court is **DIRECTED** to **CLOSE** this case. All other deadlines are **TERMINATED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on September 4, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record